IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**STEVEN M. COOPER,**

      Plaintiff,           Case No. CV 09-784-HU

    v.

                              **FINDINGS AND**

**MICHAEL J. ASTRUE,** Commissioner   **RECOMMENDATION**
of Social Security,

      Defendant.

Alan Stuart Graf
P.O. Box 98
Summertown, Tennessee 3848
    Attorney for plaintiff

Dwight Holton
Acting United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

David R. Johnson
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
    Attorneys for defendant

FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Steven Cooper brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability insurance benefits under Title II of the Social Security Act, and Supplemental Security Income benefits under Title XVI of the Social Security Act.

## Procedural Background

Mr. Cooper filed an application for benefits on August 30, 2000, with an alleged onset date of April 14, 2000. The application was denied and the decision was not appealed. Mr. Cooper filed another claim on July 28, 2003, alleging the same onset date. The claims were denied initially and upon reconsideration. Mr. Cooper requested a hearing, which was held on December 5, 2002 before Administrative Law Judge (ALJ) Ralph Jones. On February 15, 2007, the ALJ issued a decision finding Mr. Cooper not disabled.

Mr. Cooper sought review by the Appeals Council. On May 17, 2009, the Appeals Council denied review. This made the ALJ's decision the final decision of the Commissioner.

Mr. Cooper was born in 1956, and was 50 years old at the time of the ALJ's decision. He has two associate degrees, one of which is from Western States Chiropractic College, and 100 hours of massage therapy training. He worked as a self-employed massage therapist between 1985 and 1995. Other past relevant work has been as a temporary office worker and medical transportation driver. He

FINDINGS AND RECOMMENDATION Page 2

has not engaged in substantial gainful activity since April 14, 2000. He alleges disability on the basis of migraine headaches, cervical and lumbar back pain, depression, and post-traumatic stress disorder (PTSD).

## Medical Evidence

On May 6, 1997, Mr. Cooper saw Jeff Campbell, M.D., complaining of neck pain after the hood of his truck fell onto the lower portion of his neck. Tr. 219. He denied hitting his head or losing consciousness. Id. At the time of the accident, he was already taking Vicodin and Flexeril for pain in his lower back. Tr. 223. Mr. Cooper said he had headaches on occasion, but denied visual changes; he also denied chest pain, palpitations or heart irregularities. The remainder of the review of systems was negative. Tr. 219.

Physical examination revealed no cervical spine tenderness in the upper portion of the cervical spine, but some midline tenderness at C5-6. Neurologic examination was normal, and extremities were "entirely atraumatic." Id. Spinal x-rays and CT scan showed an oblique line that appeared to be evidence of a "minor incomplete and nondisplaced fracture involving the right lateral mass of C2," but "nothing acute." Tr. 220-21.

On October 27, 1997, Mr. Cooper had chest x-rays and views of the abdomen after barium enema, which were unremarkable, with no evidence of an organic colon lesion. Tr. 818, 819.

///

///

FINDINGS AND RECOMMENDATION Page 3

On December 22, 1997, Mr. Cooper saw Anne Hirsch, M.D., an internist, for right lower quadrant abdominal pain. Tr. 816. Mr. Cooper reported that he had both dull pain and stabbing pains about twice a day, lasting 30 to 40 seconds, and causing him "to drop to the floor if he is standing." Id. He denied any temporal relationship to food or bowel movements, although he reported alternating episodes of constipation and diarrhea. Id. Dr. Hirsch diagnosed probable irritable bowel syndrome (IBS) on the basis of his recent symptomatology, the fact that his symptoms were exacerbated by stress, and a recent negative barium enema. Tr. 815.

On December 15, 1998, Dr. Hirsch saw Mr. Cooper for followup of an injury on September 9, 1998. Tr. 815. Mr. Cooper said he was transferring a nursing home patient from a wheelchair into a car and strained his back. Id. Mr. Cooper said he had weakness in his legs and bilateral sciatica, along with pain in the lumbosacral area, muscle spasms, and difficulty walking. Id. He noted that sitting caused him to get sciatica all the way to his knees, with a continuous sharp stabbing pain in his right groin that "jerks him around." Tr. 814. Mr. Cooper said his symptoms had gradually worsened since the injury, and that by the end of the day his back and head ached; by the end of the week, his temper was "shot," and he had road rage. Tr. 815. Physical examination revealed significantly decreased range of motion in all directions secondary to pain. Tr. 814.

X-rays of the lumbosacral spine done that date revealed "adequate mineral content without evidence of acute injury and very

FINDINGS AND RECOMMENDATION Page 4

little in the way of significant arthritic changes." The sacrum and coccyx were also within normal limits, with both sacroiliac joints being unremarkable. Tr. 818.

Mr. Cooper returned to Dr. Hirsch on January 19, 1999. Tr. 813. He reported that medications given to him at his last appointment (Flexeril, gabapentin, orphenadrine, and Vicodin) had been effective. Id. Mr. Cooper said he was planning to take a commodities and futures course for three months, then find a different type of job. He planned to change jobs by the end of June 1999 or sooner. Id. He had returned to work on December 17, 1998 and reported doing fairly well since then. Id. Dr. Hirsch continued him on Flexeril, tramadol, gabapentin, and Vicodin. Id.

On February 4, 1999, Mr. Cooper was evaluated by Scott Jones, M.D., an orthopedic surgeon, for the back strain at work on September 9, 1998. Tr. 224. Mr. Cooper complained of low back pain, pain in the right groin, and a history of IBS. Id. Dr. Jones's review of chart notes showed that Dr. Hirsch had taken Mr. Cooper off work on December 15, 1998. Tr. 225.

Dr. Jones diagnosed low back strain by history, with no objective findings. Tr. 227. Dr. Jones wrote that expected healing time from the date of injury of September 9, 1998, "is three months maximum, which would have brought us to December 9, 1998." Id. Dr. Jones noted a "mildly positive Waddell's[1] testing in rotation," and

---

[1] Waddell's signs are responses to physical examination assessing low back disorders that are inappropriate or unexpected compared to standard physical signs and symptoms. The common feature is symptom magnification. The signs include 1) superficial and non-anatomic tenderness or non-anatomic pain

FINDINGS AND RECOMMENDATION Page 5

some "unusual characterological aspects with his loquacious high decibel and demonstrative presentation." Tr. 228. Dr. Jones thought Mr. Cooper's grandiosity in demeanor indicated possible personality disorder, but deferred to a mental health practitioner. <u>Id.</u>

On February 23, 1999, Mr. Cooper saw Dr. Hirsch after a motor vehicle accident (MVA) on the job February 22, 1999. Tr. 812. He said he was rear-ended by a car going about 15 mph while traveling at about 5 mph. <u>Id.</u> He complained of a stiff neck, but said Flexeril and Vicodin were helping. He also reported a headache. <u>Id.</u> Dr. Hirsch diagnosed muscle strain with spasm and gave Mr. Cooper an excuse for absence from work between February 23 and February 25, 1999. <u>Id.</u>

On April 7, 1999, Mr. Cooper saw Dr. Hirsch for continuous, daily headaches since the MVA on February 22, 1999. Tr. 811. He described the headaches as feeling "like a vise" around his head, occasionally associated with mild nausea and photosensitivity. <u>Id.</u> Mr. Cooper said he would like to take some time off work, as he found it difficult to drive because of neck pain. Tr. 810. Dr. Hirsch gave Mr. Cooper an injection of Demerol and Phenergan, which

---

described as deep tenderness over a wide area rather than localized to one structure; 2) simulation tests that do not correspond to the physical complaint, including axial loading and rotation; 3) inconsistent reports of pain on straight leg raising, particularly the absence of pain complaints with distraction; 4) divergence of pain beyond the accepted neuroanatomy, such as give-way weakness in many muscle groups and diminished sensation that does not follow a logical dermatomal pattern; and 5) overreaction to examination, including disproportionate verbalization, facial expression, muscle tension, tremor, and collapsing. MLS Medical Reference, https://www.mls-ime.com.

FINDINGS AND RECOMMENDATION Page 6

provided significant resolution of the headache. Dr. Hirsch excused him from work through April 25, 1999. Id.

On April 26, 1999, Mr. Cooper saw Dr. Hirsch for follow up of his tension headache. Tr. 810. He had completed physical therapy three times a week for the past two weeks, including home exercise and traction, and said his neck rotation was almost completely normal to the left without pain but still somewhat limited to the right. Id. His headaches had restarted, but responded to tramadol and to Vicodin. Id.

Mr. Cooper reported that he had had three migraines since his last visit three weeks earlier, one of which did not respond to any medication. Id. On May 6, 1999, Dr. Hirsch wrote that Mr. Cooper complained of muscle spasms in the right inguinal area which caused him to "gasp and jump" when he was driving; he was concerned about the possibility of an accident. Tr. 808. It occurred "anywhere from 0 to 3 times a day, four to five days per week, and lasts anywhere from 30 seconds to 2 minutes." Id. It was occasionally severe enough that he fell to the ground. Id. However, Mr. Cooper said he did abdominal crunches, leg lifts and stretches that did not hurt him. Id. Dr. Hirsch wrote that she was "really unsure as to how to proceed in terms of further evaluation and treatment of this problem." Tr. 807.

On May 25, 1999, Mr. Cooper was evaluated by Price Gripekoven, M.D., an orthopedic surgeon, and Lawrence Zivin, a neurologist. Tr. 232. Mr. Cooper said that in addition to the most recent MVA on February 22, 1999, his prior medical history included an MVA with

FINDINGS AND RECOMMENDATION Page 7

low back injury on August 14, 1979; a logging accident with compression fracture of T-12 in 1984; an MVA, rear-end, with neck and back injuries in 1985; a lifting injury involving low back soft tissue injury on March 30, 1993; an MVA involving cervical injury with extensive chiropractic treatment on January 10, 1995;[2] a cervical injury caused by a raised car hood falling down and striking his neck on May 6, 1997; a low back injury caused by loading and unloading a truck on August 6, 1997;[3] an MVA causing cervical injury and neck pain associated with severe headaches on January 28, 1998; a slip and fall with cervical complaints, muscle contraction headaches, extensive chiropractic treatment, and hospitalization for cervical traction in August 1998;[4] and a low back injury on September 9, 1998. Tr. 234.

Mr. Cooper told Doctors Gripekoven and Zivin his muscle tension headaches had become more severe and had been present almost without relief since the MVA on February 22, 1999. Tr. 235. He said he also had intermittent migraine headaches more frequently than normal. Id. Associated with the headaches were tension and

---

[2] A chart note dated January 31, 1995 from the VA indicates that Mr. Cooper was "doing OK," after "recent MVA, getting chiropractic for strain of back and neck," but "no acute complaints." Tr. 477.

[3] The court was unable to locate any medical documents in the record referring to this injury.

[4] There are no medical documents in the record indicating an injury or hospitalization in August 1998. See tr. 450 (chart notes for August and September 1998 from VA with no reference to injury or hospitalization), tr. 449 (VA chart note dated 10/9/98 recording "no new trauma or illness.")

1  pain in his neck and upper back. Id.

2      The doctors noted "rather theatrical exaggerated pain behavior

3  which at times was inappropriate." Tr. 239. After examination, the

4  doctors diagnosed cervical and lumbar sprain or strain and muscle

5  tension headaches. Tr. 237. They concluded that Mr. Cooper was

6  "capable of working. He presently is working full-time without

7  limitations, and we feel that he is capable of continuing with this

8  type of activity." Tr. 239.

9      On August 4, 1999, Mr. Cooper told Dr. Hirsch he had problems

10  with agoraphobia, and that he had been smoking marijuana for pain,

11  prior to going to work. Tr. 809. Dr. Hirsch advised Mr. Cooper that

12  she had "done as much for his headaches [as] I feel capable doing,"

13  and said she would refer him to a pain management clinic. Id. She

14  noted that Mr. Cooper appeared to be "doing much better" with his

15  low back pain. Dr. Hirsch recommended that he discontinue marijuana

16  because of the risks to himself and others. Id. She noted that she

17  was unsure as to the etiology of Mr. Cooper's report that day of

18  night sweats, but wrote that because Mr. Cooper had no insurance

19  besides workers' compensation, he did not want to pursue further

20  evaluation of the problem. Id.

21      On September 8, 1999, Mr. Cooper saw Dr. Hirsch. Tr. 805. He

22  said he was having difficulty turning his head to the right,

23  causing severe pain radiating down to his inferior thoracic area,

24  the right low back and down the right leg. Id.. Mr. Cooper also

25  reported depression, occasional suicidal ideation, and sleeping

26  four to five hours per night, then taking several naps during the

27

28  FINDINGS AND RECOMMENDATION Page 9

day. Id. Dr. Hirsch wrote that Mr. Cooper had had no luck finding
a new job, although he had sent out applications. Id. He was
currently working about 30 hours a week. He had not yet scheduled
an appointment with the pain management clinic she recommended
because his worker's compensation would not pay for it. Id.

On October 21, 1999, Mr. Cooper saw Dr. Hirsch for another
worker's compensation injury which had occurred on October 20,
1999. Tr. 804. Mr. Cooper told Dr. Hirsch he was helping a patient
out of a car when the patient's leg went out from under him and Mr.
Cooper grabbed him. Id. Mr. Cooper said this had caused pain in his
inferior thoracic and low back area with muscle spasms into his
right buttock and right sided sciatica, as well as bilateral lower
extremity weakness. Id. On physical examination, he had
significantly reduced range of motion of his back in all
directions. Id. Dr. Hirsch diagnosed possible bilateral
radiculopathy and lumbosacral muscle strain. Id.

On November 3, 1999, Mr. Cooper presented at the ER
complaining of severe headache. Tr. 741. He was advised to follow
up with his primary care physician.

Mr. Cooper saw Dr. Hirsch again on November 17, 1999. Tr. 803.
Mr. Cooper said he was depressed, becoming "aggressively irritable"
and had a severe headache. Dr. Hirsch wrote that Mr. Cooper's
"latest injury was on 10/20/99 and he had been off work ever
since." Mr. Cooper said he had been taking two Vicodin four to five
times a day; he also reported that over the past several weeks he
had developed nighttime incontinence and that he had difficulty

FINDINGS AND RECOMMENDATION Page 10

emptying his bladder. He also reported a recurrence of the stabbing right inguinal pain, saying that after he walked for 1 1/2 hours, he developed severe pain, _id._ along with decreased range of motion with right lateral neck rotation which caused severe headaches. _Id._ Dr. Hirsch planned to order an MRI of his lumosacral spine, restarted him on Valium and Percocet, and gave Mr. Cooper a note authorizing his absence from work through November 27, 1999. _Id._

On November 19, 1999, Mr. Cooper was given an independent medical evaluation by Steven Schilperoort, M.D., an orthopedic surgeon. Tr. 242. Dr. Schilperoort reviewed Mr. Cooper's medical records, including chart notes, physical capacities evaluations, x-rays, CT scans, and MRIs. _Id._ Dr. Schilperoort noted that Mr. Cooper reported a prior history of 13 whiplash-type injuries associated with eight MVAs, as well as on the job injuries to his back and neck. Tr. 244. Upon examination, Dr. Schilperoort found motor strength and sensory examination normal. Lumbar spine examination was also normal. However, an MRI indicated pre-existing L3-4 and L4-5 degenerative disc disease and a previous compression fracture of T12. Tr. 248. Dr. Schilperoort recorded "notable amounts of pain behavior." Tr. 247-48. He also found:

> [P]resentation today shows extreme levels of knowledge and familiarity using appropriately a large number of medical terminology [sic]. **It is felt that examinee has learned a great deal from multiple medical exposure[s], prior [massage] therapy and chiropractic instruction and is "exam-wise."** Further, this examiner feels that there is disproportionate stated levels of pain in this examinee as opposed, not only to valid objective findings, but also as opposed to his affect, behavior and movement in dealing with others, such as office staff and in his conduct and movement when not under direct

FINDINGS AND RECOMMENDATION Page 11

evaluation. This examiner feels, therefore, that there is
notable overstatement[] of level of pain.

Tr. 248. (Emphasis added)

On November 24, 1999, an MRI of the lumbar spine showed minimal degenerative changes with no nerve root compression. Tr. 817.

On December 16, 1999, Mr. Cooper saw Dr. Hirsch, reporting that overall he was feeling much better. Tr. 802. He had not gone to the pain clinic because he needed pre-authorization. Id. Mr. Cooper said his headaches and neck pain continued. He reported that he had been terminated from his job and was currently not working and unable to get unemployment benefits. Id. He was taking Percocet, Valium, and Neurontin (gabapentin), saying that without pain medications his pain was five or six on a 10 point scale; with medications, he estimated that the pain was slightly greater than three on a scale of 10. Id.

Dr. Hirsch released Mr. Cooper to work if he could limit lifting to no more than 20 pounds and did not drive except to and from work, so long as his medications did not affect his reaction time and level of consciousness. Id. He was encouraged to pursue vocational rehabilitation. Dr. Hirsch noted, "Overall, I feel that this patient is actually better than I have seen him in quite some time and hope for his continued improvement." Id.

On January 31, 2000, Dr. Hirsch wrote that disability evaluators William Smith, a neurosurgeon, and Larry Freedman, a psychologist, had concluded that Mr. Cooper was medically stationary, and that they had told her "good treatment for patients

FINDINGS AND RECOMMENDATION Page 12

1 like this is to make medically stationary and tell them to make
2 tough decisions in their life and get on with their life. ...
3 [R]einforcing pain that is nonexistent is not helpful to these
4 patients." Tr. 801.

5     On February 7, 2000, Dr. Hirsch examined Mr. Cooper. Tr. 800.
6 He had mildly decreased range of motion in his neck and back,
7 secondary to pain. Id. Dr. Hirsch told Mr. Cooper that she agreed
8 with the evaluators that he was medically stationary, and that the
9 disability consult "did not indicate any permanent disability
10 associated with this." Tr. 801. Dr. Hirsch wrote, "I do not feel
11 that medical marijuana has any place in the treatment of his pain
12 as he is not a candidate for this type of medication and as there
13 are other alternatives that ... would be better." She encouraged
14 Mr. Cooper to follow through with a pain management clinic. Id.

15     On April 14, 2000, Mr. Cooper presented at the emergency room
16 stating that he had been rear-ended by another car while stopped.
17 Tr. 261.  Mr. Cooper said he felt his neck snap back, then felt
18 pain in his neck and lower back. Id. He was examined by Mark Vanko,
19 M.D., who diagnosed cervical strain. Tr. 262. An x-ray of the
20 cervical spine showed no significant abnormality. Tr. 263.

21     On April 21, 2000, Mr. Cooper saw Dr. Hirsch, reporting that
22 the April 14, 2000 accident caused immediate pain along the right
23 lateral neck, radiating into the right side of his face and down
24 his right arm. He also had a severe occipital headache that
25 radiated into the front of his head at that time. Tr. 801. Since
26 the accident he had developed chest wall pain over his sternum that

27

28 FINDINGS AND RECOMMENDATION Page 13

increased with deep breaths, spasms along his entire back and neck, numbness and weakness in his right arm, and a feeling like "a feather tickling deep inside his right ear." Tr. 799. Dr. Hirsch diagnosed trapezius muscle strain and lumbar muscle strain. Id. Dr. Hirsch encouraged him to follow through on a referral to Joan Takacs, D.O., a psychiatrist. Id.

On May 2, 2000, Mr. Cooper saw Kevin Kane, D.O., specialist in physical medicine and rehabilitation, for evaluation of back, neck and head pain. Tr. 327. He reported daily headaches and a disabling degree of pain in the neck. Id. Mr. Cooper related the onset to aggravation of preexistent chronic pain from MVAs in February 1999 and April 2000, both being rear-end type accidents. Id. He reported continuous pain in the 8/10 range without the use of medications. With his current medication regiment, his pain was in the 4/10 region most of the time. Id. His medications were Celexa, BuSpar, Flexeril, and OxyContin, 20 mg. twice a day. Id. He reported using Neurontin in the recent past and said it helped with pain he was having in the right inguinal region. Id. He also reported using marijuana to assist with analgesia. Id.

Mr. Cooper reported the following trauma history to Dr. Kane: in 1977, a "sideways" whiplash and a roll-over MVA; MVA in 1978 involving cerebral concussion when the car struck a telephone pole; MVA in the early 1980s with neck and back injuries when he was "T-boned" at a stoplight; another rear end MVA in 1985, with neck injuries; lumbosacral strain at work in 1992; "T-bone" MVA in 1995; "T-bone" MVA at 60 mph in 1996, with neck, back and lumbosacral

FINDINGS AND RECOMMENDATION Page 14

injury; three workers compensation back and neck claims in 1996 and

1997; two MVAs in 1998, both involving rear-ending, and both being

workers compensation claims for lumbosacral strain/sprain; MVA

involving rear-ending in 1999; lumbosacral strain/sprain at work,

also in 1999; MVA in April 2000, another rear-ending, with

significant exacerbation of neck pain.[5]  Tr. 327. Mr. Cooper

reported having almost daily headaches since the MVA in April 2000,

and stated he was currently afraid to drive, staying at home as

---

[5] There are numerous discrepancies in Mr. Cooper's trauma history reporting. In May 1999, Mr. Cooper had told Dr. Gripekoven he had MVAs in 1979, 1985, 1995, and 1998. He also reported a logging accident in 1984, a lifting accident in 1993, the injury to his neck from the car hood in 1997, an injury while unloading a truck in 1997, a slip and fall in August 1998 that required hospitalization for neck traction (an episode not reported to any other practitioner), and a 1998 back injury. In November 1999, Mr. Cooper told Dr. Schilperoot he had had 13 whiplash injuries, eight of which were the result of MVAs. On January 29, 2004, Mr. Cooper reported to Christopher Tongue, Ph.D., an MVA in 1977, in which he suffered a concussion and whiplash after hitting a telephone pole; a rollover MVA in 1978 in which he suffered "only bruises;" (the order of these two events was reversed in his report to Dr. Kane), a side-swipe MVA in 1980 from which he suffered neck strain (not mentioned to Dr. Kane); a logging injury in 1983 in which he suffered a T-12 compression fracture and was in bed for nearly 12 months (not mentioned to Dr. Kane); rear end MVA in 1985, causing neck strain; an on the job injury to his low back while moving boxes, also in 1985 (not mentioned to Dr. Kane); another MVA in 1995, which caused him to be off work for a year as a result of concussion and whiplash (the only concussion mentioned to Dr. Kane was in 1978); an MVA in 1998, in which he was rear-ended and suffered neck strain; an MVA in 1999, also resulting in neck injury; and an MVA in 2000, in which he was rear ended and reported that he lost consciousness briefly and again suffered neck and upper back strain. Tr. 830. Mr. Cooper's hospital records from the MVA on April 14, 2000 indicate that he denied loss of consciousness at that time. Tr. 261. Mr. Cooper is either intentionally giving false reports or so inaccurate he cannot be relied on as an accurate historian.

1  much as possible. Id. Upon examination, Dr. Kane noted that Mr.

2  Cooper was able to move about without pain behavior except from

3  guarding upper back and neck movements. Tr. 328. Range of motion

4  through the vertebral column was essentially full. Id. Ideation was

5  straightforward, but with some "somatic and pain focus." Id.

6  Neurologic examination was normal. Orthopedic examination showed no

7  gross range of motion deficits or deformities of the joints, no leg

8  length inequality and only slight pelvic obliquity. Id. Cervical

9  examination showed that Mr. Cooper "self-limits with reports of

10  pain at end range" of flexion, extension, side bending and

11  rotation. Id. Soft tissue examination showed tenderness throughout

12  the upper back, neck and shoulder girdles. Id. Dr. Kane's diagnoses

13  were chronic cervicothoracic and lumbar paravertebral pain, muscle

14  tension-type headaches, probably secondary to multiple trauma

15  history; anxiety and some reactive depressive symptoms, also

16  related to trauma and to intractable somatic pain; and sleep

17  disturbance. Tr. 329. Dr. Kane noted that Mr. Cooper was currently

18  out of work. Id.

19      On May 4, 2000, Mr. Cooper was given a two-hour physical

20  capacities evaluation. Tr. 264. The examiner noted that Mr.

21  Cooper's lumbar range of motion numbers were not valid for rating

22  purposes because Mr. Cooper failed a validity check. Tr. 272.[6] It

23  was determined that Mr. Cooper demonstrated capacities in the light

24

25      [6] Dr. Schilpooert had also noted that range of motion testing

26  for forward flexion and extension of the lumbar spine did not
   meet validity reproducibility criteria, rendering them invalid.

27  Tr. 247.

28  FINDINGS AND RECOMMENDATION Page 16

work range. Tr. 272.

On May 9, 2000, Mr. Cooper saw Dr. Kane for "moderately severe headache." Tr. 326. He was wearing dark glasses indoors for photophobia associated with the headaches. Id. He was started on Ambien and Celexa. Id. On May 11, 2000, Mr. Cooper reported pain at about four on a scale of 10. Tr. 325.

On May 16, 2000, Mr. Cooper told Dr. Kane that his symptoms were about the same, but he was sleeping better. Tr. 322. Dr. Kane instructed Mr. Cooper in stretching techniques. Id. Dr. Kane also recommended reconditioning, including aquatics. Id. On May 23, 2000, Mr. Cooper reported gradual improvement in discomfort and ability to sleep. Tr. 321. He had taken no pain medication for the past week. Id. On June 1, 2000, Mr. Cooper again reported to Dr. Kane that his symptoms continued to improve, but asked to be taken off Celexa because of diminished libido. Dr. Kane agreed to substitute Effexor for Celexa and BuSpar. Tr. 319. Upon examination, Dr. Kane noted less tenderness, and again recommended active rehabilitation, relying on walking and aquatics. Id.

On June 6, 2000, Dr. Kane referred Mr. Cooper for a TMJ dysfunction evaluation. Tr. 317. On June 13, 2000, Mr. Cooper told Dr. Kane he was keeping a journal that recorded medication use, pain levels and activity. Tr. 316. Mr. Cooper reported poor sleep, lasting only two to four hours at a time and waking with pain in the neck and head, as well as daily headaches, lasting throughout the day. Id. His current medications were OxyContin, Percocet, and Effexor. Id. Dr. Kane concluded that if there were no significant

FINDINGS AND RECOMMENDATION Page 17

improvement over the next several weeks, he would consider evaluation by a neurologist. Id. Dr. Kane wrote, "It appears he is not predisposed to much exercise, so he may need ... reinforcing for these behaviors." Id.

On June 13, 2000, Mr. Cooper saw Dr. Hirsch with complaints of severe anxiety attacks whenever he had to leave the house, ever since his last MVA. Tr. 798. Dr. Hirsch noted that Mr. Cooper had been seeing Dr. Kane for osteopathic manipulation and massage once a week. Id. Mr. Cooper said he was being referred to a TMJ physical therapy specialist the following week for symptoms of right TMJ syndrome, and that Dr. Kane had recommended swimming three times a week for conditioning, but "the patient find[s] it hard to get to the swimming pool." Id. Dr. Hirsch wrote that Mr. Cooper had been keeping a diary of his pain and reported that his headaches were much worse than his low back pain. Id. Mr. Cooper reported that his headaches had been much worse since the last MVA, and that his sleep patterns were still irregular. Id. He said vocational rehabilitation was "currently on hold as he is unable to concentrate." Id. Dr. Hirsch continued, "If he is disabled, then he no longer has to make his student loan payments and thus brings in a form for me to fill out today. He states that his medica[l] conditions for this include headaches, trapezius muscle strain, low back pain, anxiety and PTSD." Id.[7] Dr. Hirsch continued him on Oxycontin and Percocet. Id. The chart note does not indicate

---

[7] There is no medical record documenting these reports by Mr. Cooper of a diagnosis of PTSD. Eventually, this diagnosis is refuted by Dr. Wicher. See page 27, infra.

FINDINGS AND RECOMMENDATION Page 18

1  whether Dr. Hirsch provided the requested documentation.

2  _____In a note of a phone contact, Dr. Kane recorded that Mr.

3  Cooper called to report a severe anxiety attack the previous day,

4  June 15, 2000, while driving. Tr. 315. Mr. Cooper thought the

5  anxiety might be a side effect of the Effexor. Id. Mr. Cooper said

6  he had been taken to the emergency room, where he was injected with

7  Valium. Id. Mr. Cooper reported feeling suicidal in the midst of

8  his anxiety attack. Id.

9  _____On June 20, 2000, Mr. Cooper reported moderate anxiety over

10  the past few days to Dr. Kane. Tr. 314. He had resumed Celexa and

11  BuSpar. Id. Mr. Cooper said his anxiety was "triggered by driving

12  or even riding as a passenger," which inhibited his ability to

13  obtain therapy for TMJ. Id. Dr. Kane started him on a trial of

14  Zoloft, recommending that he continue to take BuSpar. Id. Dr. Kane

15  observed that Mr. Cooper was agitated, "with tapping motions of his

16  hands and feet." Id. Mr. Cooper reported no longer having suicidal

17  ideation. Id. However, in a chart note dated June 21, 2000, and

18  signed by someone other than Dr. Kane, he was recorded as arriving

19  "wringing and clenching his hands," and reporting that he had

20  suicidal ideation. Tr. 313. Mr. Cooper was reported as saying, "All

21  I want is for the pain to stop." Id. Mr. Cooper said he had not

22  followed up with pool exercises, due to agoraphobia that commenced

23  in February 2000. Id.

24      On June 27, 2000, Dr. Kane wrote a note allowing Mr. Cooper to

25  remain off work until July 14, 2000. Tr. 312. Dr. Kane recorded

26  that Mr. Cooper was more jovial and more animated than usual. Tr.

27

28  FINDINGS AND RECOMMENDATION Page 19

311. Mr. Cooper related that he had been using marijuana to control anxiety with good results. He stated that he had "smoked a bowl" just prior to arriving at Dr. Kane's office, and asked Dr. Kane to consider authorizing medical marijuana to "address his post-traumatic stress disorder." Id. Dr. Kane observed that Mr. Cooper seemed "significantly more relaxed," with "no tremulousness," and "less distracted by somatic pain." Id. Dr. Kane said he was not comfortable with authorizing medical marijuana, although there appeared to be benefits from it. Id. Dr. Kane wrote that Mr. Cooper had "many features of post traumatic stress disorder." Id.

On July 3, 2000, Dr. Hirsch wrote that Mr. Cooper reported continuing anxiety attacks "with any driving whatsoever," and that it was "extremely limiting in terms of his life." Tr. 796. Mr. Cooper said he found that "the only thing that helps when he has an acute headache is smoking marijuana. Dr. Kane plans to fill out forms for medical use of marijuana after his current evaluation is completed." Id. On examination, his back was found to have "mildly decreased" range of motion in all directions secondary to pain. Id.

On July 11, 2000, Mr. Cooper was seen by neurologist Christina Peterson, M.D. at the Oregon Headache Clinic, to which he had been referred by his primary care physicians, Anne Hirsch, M.D., and Kevin Kane, D.O. Tr. 283. Mr. Cooper reported onset of migraine headaches in 1990, growing progressively worse, and said he was currently experiencing daily headaches "as well as superimposed migraines." Id. He described the headaches as throbbing pain associated with photophobia and made worse with exertion; he

FINDINGS AND RECOMMENDATION Page 20

described the superimposed migraines as more severe and with associated sonophobia as well as photophobia. Id. He said the migraines were sometimes preceded by an aura of black spots before the eyes, lasting "anywhere from hours to days at a time." Id. He was currently experiencing two a month. Id. Imitrex helped this headache type about 50% of the time. Id. He said his daily headaches had started after the MVA in February 1999. Tr. 284.

Mr. Cooper reported that he "has used, for a variety of reasons, narcotics off and on since 1984." Tr. 283. He described an extensive medical history including a compression fracture at T12; mitral valve stenosis;[8] several psychiatric admissions and a diagnosis of PTSD;[9] the on the job injury in 1999; and the motor vehicle accident of April 2000. Tr. 284. He was currently taking Zoloft, Oxycontin with supplemental Percocet, Flexeril, BuSpar, and Neurontin. Tr. 284.

Mr. Cooper stated that he had a history of chronic photosensitiviity, as well as disturbed sleep, IBS, and agoraphobia. Tr. 284. Examination was essentially normal. Tr. 286. Dr. Peterson thought it unclear whether Mr. Cooper's headaches were post-traumatic, due to medication rebound, or some combination of

---

[8] This statement appears to be related to an echocardiogram done in August 1989, which indicated that Mr. Cooper's mitral valve had "mild thickening of the mitral leaflets," but no signs of "the traditional criteria for mitral valve prolapse." Tr. 658. Doppler indicated normal mitral flow and velocity, and mild mitral regurgitation. Id.

[9] There are no records supporting these alleged psychiatric admissions. As noted previously, the record contains no diagnosis of PTSD by any mental health practitioner.

FINDINGS AND RECOMMENDATION Page 21

the two. Tr. 286. In her opinion, the headaches were a combination of post-traumatic headaches related to the February 1999 and April 2000 motor vehicle accidents and the "frequent use of chronic narcotics." Tr. 287. She noted that people with pharmacologically maintained rebound headache syndromes often did not do well with preventive medications. Id. She recommended continued increase in his dosage of Neurontin and the use of Clonidine to help him get off narcotic medications. Id. However, she concluded, "unless Mr. Cooper is seeing a significant beneficial effect from the chronic narcotic regimen, he would probably do as well without it." Id.

On July 25, 2000, Mr. Cooper told Dr. Kane he was using Neurontin and experiencing partial pain improvement. Tr. 306. He reported that his low back was a great deal improved, neck and head pain mildly improved. Id.

A summary report from James A. Farley, M.D., dated March 5, 2001, states that when he first saw Mr. Cooper on July 26, 2000, Mr. Cooper said he had been "tentatively diagnosed with PTSD[10] after having three car accidents in which he was rear-ended." Tr. 344. Mr. Cooper reported headaches and depression since an MVA in February 1999, and a marked increase in headache pain, anger, depression and frustration after an MVA on April 14, 2000. Id.

Mr. Cooper told Dr. Farley that before November 2009, he had only a "mild tendency" to stay at home, but since then he had noted a "marked increase in anxiety and social withdrawal with difficulty

---

[10] Again, no mention of the practitioner who allegedly offered this tentative diagnosis.

FINDINGS AND RECOMMENDATION Page 22

leaving his home," that it was "nearly impossible for him to drive and difficult for him to be around groups of people." <u>Id.</u> Mr. Cooper said that after the MVA on April 14, 2000, he had a "profound increase in depression and ... agoraphobia." <u>Id.</u>[11]

Dr. Farley diagnosed major depression, recurrent, moderate to severe, non-psychotic; anxiety symptoms with panic attacks and agoraphobia with possible PTSD; and tobacco dependence. Tr. 345. Dr. Farley also thought there could "possibly be a mixed personality disorder with schizoid features present." <u>Id.</u>

On August 1, 2000, Dr. Kane wrote that Mr. Cooper reported stable mood, improved analgesia with less Oxycontin. Mr. Cooper attributed the improvements in pain and anxiety to the Neurontin. Tr. 302. Mr. Cooper said he was using marijuana occasionally and "this seems to mitigate situational anxiety." Mr. Cooper told Dr. Kane his psychiatrist, Dr. Farley, "concurs that he meets the criteria for PTSD." <u>Id.</u>[12] Dr. Kane wrote a note taking Mr. Cooper off work through August 20, 2000. Tr. 305. Dr. Kane encouraged Mr. Cooper to return to gainful employment and conditioning exercises.

---

[11] However, the record indicates that Mr. Cooper told Dr. Wicher he had been treated for agoraphobia in 1994, and told Dr. Hirsch he had agoraphobia in August 1999.

[12] There is no indication in the record that Dr. Farley diagnosed PTSD. On November 10, 2000, Dr. Kane wrote a letter to an insurance claims specialist saying,
> I am still unsure of whether a psychiatrist, be it Dr. Farley or Dr. Bellville [who does not appear in the record before the court], has diagnosed post traumatic stress disorder and whether this is considered related to the MVA of 4/14/00. I received no chart notes from Dr. Farley regarding Mr. Cooper's treatment.

Tr. 872.

FINDINGS AND RECOMMENDATION Page 23

1   Id.

2      On August 4, 2000, Dr. Kane wrote a letter on Mr. Cooper's

3   behalf. Tr. 299. Dr. Kane opined that the April 2000 MVA seemed to

4   have been the "straw that broke the camel's back,"[13] and "if he can

5   be relied upon as a historian, there was a dramatic increase in

6   frequency and severity of neck and head pain in particular

7   subsequent to that most recent MVA." Id.

8      Dr. Kane wrote that Mr. Cooper's back pain had improved to

9   intermittent and mild, but that another important possible

10  consequence of the April 2000 MVA was

11      that there are impairments consistent with ... PTSD which
        presently manifest as agoraphobia and profound anxiety
12      and apprehension about getting behind the wheel of a
        vehicle.[14] This poses obvious barriers to return to
13      gainful employment. I am addressing this from my area of

14  _____

15      [13] Although Dr. Kane also stated in the letter that the April
    14, 2000 MVA was a "rear end collision at low velocity," and "I
16  have reviewed the photograph of the rear end of his car which
    shows no appreciable damage whatsoever." Tr. 299.
17

18      [14] According to the *Diagnostic and Statistical Manual of
    Mental Disorders*, Fourth Edition Text Revision (DSM-IV-TR), the
19  diagnostic criteria for PTSD are 1) exposure to a traumatic event
    in which both of the following were present: a) the person
20  experienced, witnessed, or was confronted with an event or events
    that involved actual or threatened death or serious injury, or a
21  threat to the physical integrity of self or others; **and** b) the
    person's response involved intense fear, helplessness or horror.
22  The other diagnostic criteria are 2) persistent reexperiencing of
    the traumatic event through recurrent and intrusive
23  recollections, dreams, feelings that the event is recurring, or
    intense psychological distress at exposure to cues that symbolize
24  an aspect of the traumatic event; 3) persistent avoidance of
    stimuli associated with the trauma and numbing of general
25  responsiveness; 4) persistent symptoms of increased arousal such
    as difficulty falling or staying asleep, hypervigilance,
26  difficulty concentrating, outbursts of anger, and exaggerated
    startle response. DSM-IV-TR at 467-68.
27

28  FINDINGS AND RECOMMENDATION Page 24

expertise, namely medicine management and appropriate physical medicine modalities to reduce pain as well as some counseling and encouragement to regain an active lifestyle. I have recruited the assistance of Dr. Farley, a psychiatrist who knows Steven from prior treatment, to assist in optimizing any form of management available to address the PTSD.

* * *

I anticipate that he could return to work as soon as late August. I have encouraged him to begin self directed efforts at finding work that he could tolerate, perhaps ... reading a meter ... which would not require use of an automobile....

* * *

I would like to withhold specific restrictions until later this month when the results of recent medication changes may make it possible for him to do more than he can at present. I will also be eager to hear from Dr. Farley after subsequent visits regarding what input he may have relative to this question, especially considering the PTSD diagnosis. I do not consider his pain to be necessarily a limiting factor, but I lack expertise in the psychiatric diagnosis to say with authority whether the PTSD is a limiting factor. My hope is [that] we can see a smooth transition back to gainful employment ... [in] 1-3 months.

Tr. 300.

Mr. Cooper had a comprehensive psychological evaluation by Donna Wicher, Ph.D. on August 15, 2000. Tr. 274. While he only saw Dr. Wicher once, it is not clear from the record whether it was as a treating psychologist or an examiner. Mr. Cooper endorsed many depressive symptoms, including anhedonia, hopelessness, fatigue, stress, nervousness, sadness, anger and irritability, feelings of panic, difficulty concentrating, intermittent suicidal ideation, insomnia, and nightmares. Tr. 276. He reported that he had PTSD secondary to a series of motor vehicle accidents: he estimated that

FINDINGS AND RECOMMENDATION Page 25

he had been in eight accidents during his life,[15] and said he had been rear-ended three times in the previous three years. Id. He said as a result, he was fearful while driving, experiencing gastrointestinal distress, hot and cold flashes, and sweaty palms. Id. He reported that he also no longer felt safe at home, his feelings of fearfulness at home intensifying since the most recent motor vehicle accident. Id.

Mr. Cooper said he had had problems with depression and anxiety for years. Tr. 275. He reported that he was first seen for suicidal ideation with a suicide attempt in 1976 when he was in the military. Id. He had failed to get a promotion and was accused of stealing a weapon, and saw a psychiatrist for a few months. In 1978 and 1979, he went through court-ordered diversion treatment related to substance abuse. Id. He was hospitalized for a few days in 1994 when, by his report, he had a psychotic reaction to trazodone. Tr. 276. He subsequently saw a psychiatrist for six or seven months after being released from the hospital, and was treated for agoraphobia with medications and psychotherapy. Id. He received outpatient treatment for six to nine months for a relationship problem in 1996. Id. For the past month he had been seeing a psychiatrist for depression, taking Zoloft, 100 mg. per day. Id.

Testing showed a Full Scale I.Q. score of 119, high average. His profile on the Minnesota Multiphasic Personality Inventory

---

[15] Mr. Cooper reported four MVAs to Dr. Gripekoven in 1999, eight MVAs to Dr. Schilperoot in November 1999, 10 MVAs to Dr. Kane in May 2000, "between nine and 12" at the VA hospital admission in April 2001, and seven MVAs to Dr. Tongue in January 2004.

(MMPI-2)indicated mild to moderate depression and some degree of anxiety. Tr. 277.

Mr. Cooper reported that he was currently using medical marijuana, and that he used amphetamines for a year and a half in the 1970s and crack cocaine on a daily basis between 1977 and 1983. Id. He had not had substance abuse treatment. Id. However, Dr. Wicher noted that Mr. Cooper was "reportedly ... not approved" for medicinal marijuana. Tr. 278.

Dr. Wicher diagnosed Major Depressive Disorder, Recurrent, Moderate; Anxiety Disorder, Not Otherwise Specified (NOS); cocaine and amphetamine abuse, in remission; and marijuana misuse. Tr. 278. Although Mr. Cooper reported having been diagnosed with PTSD, Dr. Wicher found that he did not meet the diagnostic criteria. Id. Dr. Wicher wrote that Mr. Cooper's "levels of depression and anxiety at the present time, by his report, are quite debilitating," noting that he reported difficulty leaving the house and driving. Tr. 279. Dr. Wicher thought these anxiety symptoms presented "a significant obstacle to working at the present time," but that with "appropriate treatment," it was expected that he "could be able to return to work in the future, particularly as there are no cognitive or mental barriers to his being able to do so." Id.

On August 16, 2000, Dr. Kane wrote that Mr. Cooper reported "some mild to moderate depressive spells but these clear in a day or two." Tr. 297. He denied suicidal ideation, but remained apprehensive about driving. Id. Dr. Kane observed that Mr. Cooper had "minimal pain behavior now." Id.

FINDINGS AND RECOMMENDATION Page 27

1    On August 23, 2000, Dr. Kane noted that Mr. Cooper had reduced

2 his opioid use to Oxycontin once a day, and Percocet about four

3 times a week. Tr. 296. Mr. Cooper said he still had daily

4 headaches, but severity was about six on a scale of 10. Id. Dr.

5 Kane concluded that Mr. Cooper had "some improvements in analgesia

6 with high dose Neurontin (2400 mg. per day) with "no untoward

7 effects." Id. He also wrote that "[p]ost-traumatic stress disorder

8 is a working diagnosis." Id.

9    On August 31, 2000, Dr. Kane wrote that Mr. Cooper attributed

10 most of his aggravated symptoms, including worsening headaches and

11 fear of driving, to the April 2000 MVA, which put him "over the

12 edge." Tr. 293.

13    Dr. Farley saw Mr. Cooper on September 12, 2000. Tr. 346. Mr.

14 Cooper said he was feeling better on Zoloft, but that his pulse was

15 high whenever he had to leave home. He said he could not drive and

16 had problems with public transportation. Id.

17    On September 14, 2000, Dr. Kane wrote a letter on Mr. Cooper's

18 behalf. Tr. 290. He noted that Mr. Cooper had "had some twelve

19 motor vehicle accidents, many of them quite severe," and that he

20 had "intractable pain in the upper back and neck and chronic

21 headaches." Id. Dr. Kane wrote,

22       He also has post-traumatic stress disorder. These
         impairments do interfere with sustained concentration and
23       social interaction. At this stage it is difficult for me
         to say that he is not capable of some form of sedentary
24       work, however, he would probably have to opt for a job
         that did not engage his agoraphobia or his automobile-
25       induced panic.

26 Id.

27

28 FINDINGS AND RECOMMENDATION Page 28

On October 3, 2000, Mr. Cooper complained to Dr. Farley of pain increasing pain, anxiety and problems sleeping. Tr. 346. Mr. Cooper told Dr. Farley that Dr. Kane was "involved in considering the diagnosis of postconcussion syndrome for him." Id.

On October 18, 2000, Mr. Cooper told Dr. Farley he was feeling "terrible," with insomnia, night sweats, and marked deterioration of mood. Tr. 346. He reported that the insurance company had stopped covering his pain medications from Dr. Kane. Id. Dr. Farley renewed the prescriptions for Zoloft and BuSpar.

In a chart note dated November 6, 2000, Roy Breen, M.D. recorded that he received a call on November 4, 2000 from Mt. Hood Medical Center emergency department about Mr. Cooper. Tr. 331. He had come into the ER with abdominal pain, chills and low fever, and liquid stools. Id. He was thought to have diverticulitis, but he was not ill enough to require hospitalization. Id.

Dr. Breen saw Mr. Cooper on November 6, 2000, on referral from his primary care physician, Dr. Hirsch. Id. Mr. Cooper said his bowel movements had been irregular, and that he "feels he has irritable bowel syndrome." Id. Mr. Cooper said he also had PTSD, anxiety and depression, chronic back problems, and a diagnosis of a "stenosed" heart valve. Id.

Upon examination, Dr. Breen found no heart murmur, and regular heart rate and rhythm. Bowel sounds were normal, with tenderness localized to the left lower quadrant. Id. No masses were palpable and there were no peritoneal signs. He did have hemorrhoids, but Dr. Breen found his tenderness "out of proportion to hemorrhoidal

disease." Id.

Dr. Breen's impression was probable sigmoid diverticulitis and hemorrhoids. A CT scan was scheduled. Tr. 332. The CT scan on November 7, 2000 was unremarkable. Tr. 333. On December 4, 2000, Dr. Breen noted that he had performed a full colonoscopy that day. Id.; tr. 336-37. Dr. Breen saw no diverticulosis, but hemorrhoids were intermittently bleeding. Id. Mr. Cooper was scheduled for office treatment of the hemorrhoids. Id.

On December 7, 2000, Mr. Cooper reported to Dr. Kane that he had had disabling degrees of pain as well as ongoing agoraphobia and anxiety when being in or around motor vehicles. Tr. 871. Dr. Kane thought the "only appropriate next step" was referring Mr. Cooper to a chronic pain management clinic. Id. He restarted Mr. Cooper on Neurontin and Oxycontin, despite having concluded that rebound phenomena were playing a role in his headaches. Id. Dr. Kane diagnosed "profound anxiety and depression," as well as "features of" PTSD. In Dr. Kane's opinion, Mr. Cooper's "mental health diagnoses stand as an obstacle to re-entering the work force." Id.

Mr. Cooper saw Dr. Farley on December 8, 2000 for complaints of increased pain and anxiety. Tr. 347. Dr. Farley prescribed Zyprexa and told him to continue on the Zoloft and BuSpar. Id.

Mr. Cooper's last visit to Dr. Farley was on December 22, 2000. Tr. 347. Mr. Cooper reported spending more time in his house and feeling more depressed. He was taking the Zyprexa, Zoloft and BuSpar, as well as Neurontin and Oxycontin. Dr. Farley increased

FINDINGS AND RECOMMENDATION Page 30

1  his BuSpar, Zoloft and Zyprexa dosages. Id.

2      On January 24, 2001, Mr. Cooper was seen by internist Michael

3  Wilson, D.O., for a comprehensive physical examination. Tr. 340.

4  Mr. Cooper's complaints were recorded as headache, neck and back

5  pain, diverticulitis, mental disorders, and heart problems.[16] Id.

6  Mr. Cooper reported constant neck and back pain and headaches on a

7  daily basis, with neck and back pain at a level of 2/10 "at the

8  very best," and averaging 5.5. His neck and back pain were

9  aggravated by light and "rapid head movements," as well as by

10 "tension" and "everyday normal activities." He said he was limited

11 to standing for about two hours and walking for about 45 minutes.

12 Id.

13     Mr. Cooper reported a "bout of diverticulitis in October of

14 2000," and, after a colonoscopy in December 2000, "a diagnosis of

15 irritable bowel syndrome."[17] Mr. Cooper also reported that he had

16 been diagnosed with PTSD, agoraphobia, panic disorder, and

17

18

19  ─────────────────

20     [16] The record contains no evidence of treatment for heart
    problems prior to or after this statement. Cardiac examinations
21  on May 6, 1997 (tr. 219), April 14, 2000 (tr. 261), January 24,
    2001 (tr. 341), and March 14, 2006 (tr. 893) were all normal. EKG
22  and chest x-rays taken on March 14, 2006 were also normal. Id.

23     [17] The CT scan and colonoscopy done by Dr. Breen in December
    2000 showed only hemorrhoids. Tr. 333-37. In 1998, Anne Hirsch,
24  M.D., Mr. Cooper's primary care physician wrote in a chart note
    that in view of Mr. Cooper's recent symptomatology [alternating
25  constipation and diarrhea, with cramping, see tr. 816], the fact
    that he reported exacerbated symptoms with stress, and a recent
26  negative barium enema, she felt "relatively comfortable that this
    patient's symptoms represent [IBS]." Tr. 815.
27

28 FINDINGS AND RECOMMENDATION Page 31

depression.[18] Upon examination, Dr. Wilson found that the

> pain that the claimant reports in terms of his neck and back was not consistent with objective findings. The claimant's functional limitations are based much more on subjective complaints rather than on objective findings. In terms of his musculoskeletal exam, it was normal with the exception of some minimally decreased range of motion in his cervical and lumbar spine and even that was equivocal. I would be concerned about having this claimant on long term narcotics for treatment of his neck and back pain, especially in view of the fact that he was a substance abuser in the past and continues to abuse marijuana. Claimant was noted to be fully able to reach, hold, grasp, manipulate, rise, stand, and walk from a seated position. ... He did appear to be depressed.

Tr. 342-43.

On January 4, 2001, Dr. Kane noted that Mr. Cooper was stable with his current medications (Oxycontin, BuSpar, Zoloft, Zyprexa) and reported a more stable mood and a slight increase in functional capacity. Tr. 869. Mr. Cooper said his panic was less severe and less frequent. Dr. Kane observed that Mr. Cooper had "not much pain behavior today," and that he had a goal of going to Europe in the fall. Id. He demonstrated functional range of motion through the

---

[18] The court has found no evidence in the record that Mr. Cooper has been actually diagnosed with PTSD by a mental health professional. Although Mr. Cooper reported having been diagnosed with PTSD to Dr. Wicher and to Dr. Kane, Dr. Wicher, a psychologist, found that he did not meet the diagnostic criteria. Mr. Cooper told Dr. Kane that his psychiatrist, Dr. Farley, "concurs that he meets the criteria for PTSD." However, according to Dr. Farley's report, at their first meeting, Mr. Cooper told Dr. Farley "that he had been tentatively diagnosed with PTSD after having three car accidents in which he was rear-ended." Tr. 344. Dr. Farley's initial diagnostic impression was "major depression, recurrent, moderate to severe, non-psychotic; anxiety symptoms with panic attacks and agoraphobia with *possible* PTSD." Tr. 345 (emphasis added). There is no indication in the record that Dr. Farley confirmed PTSD. Nevertheless, the ALJ made a finding that Mr. Cooper's PTSD was a severe impairment. Tr. 16.

FINDINGS AND RECOMMENDATION Page 32

vertebral column. Id.

On February 6, 2001, Dr. Kane again observed "not much pain behavior." Tr. 866. However, Mr. Cooper said he felt high levels of stress "relating to his unemployment and his ongoing efforts to secure an attorney." Id. Dr. Kane wrote, "I advocate that he consider bringing the matter to closure without further legal action and moving on." Id. Dr. Kane thought Mr. Cooper appeared "a little anxious," with his ideation "mildly somatic [sic] focused." Id. Mr. Cooper asked Dr. Kane to sign a form authorizing medical marijuana for pain control, but Dr. Kane declined. They discussed "active self-directed rehabilitation and reconditioning efforts," as well as pain management classes. Id.

On March 20, 2001, Mr. Cooper was given a psychodiagnostic evaluation by Stephen Huggins, Psy.D. Tr. 376. Mr. Cooper reported that his current symptoms were depression, panic attacks and agoraphobia, saying that when he experienced panic attacks, his heart pounded, his palms sweated, and he developed a foul body odor. Id. Mr. Cooper said the panic attacks had started in April 2000 after he experienced an MVA. Id. The agoraphobia focused primarily around fear of being in cars to the point where he no longer drove. He said he experienced headaches and IBS. Tr. 377. With respect to the IBS, Mr. Cooper said he had had it for years but that it had grown worse over the last 1 1/2 years. Id. Mr. Cooper said the IBS could "send me to the bathroom two to three times an hour for two to three hours at a time." Id.
///

FINDINGS AND RECOMMENDATION Page 33

Mr. Cooper said he had felt depressed for one to two years. Id. He reported daily headaches ranging between five and seven on a 10-point scale, as well as significant neck and upper back injuries. Id. Mr. Cooper said he never left home except to go to doctors' appointments, but that he was trying to get over not feeling safe by "working his way out of it through taking walks with supportive people." Id. He also hoped to enroll in a Spanish class at Mt. Hood Community College. Id.

Mr. Cooper said he typically slept from 4:30-9 a.m. only. Id. His energy level was low, but his appetite was "too good." Id. He had worked his way up to going about a mile on the treadmill, but "this distance is quite low relative to where he has been in the past." Id. His current hobby was computer correspondence courses. Tr. 378. Dr. Huggins diagnosed major depression, recurrent, severe; and panic disorder with agoraphobia. Tr. 380. He concluded:

> He appears to subjectively report symptoms of depression and also objectively reports symptoms of depression with a [Beck Depression Inventory-II or BDI-II] score of 38 which places him in the severely depressed range; however, his interactions with this examiner seemed a little bit inconsistent in that he did not present with nearly the level of depression that he verbally reported or that was indicated on the BDI-II.

Id.

Mr. Cooper was admitted to the VA hospital for two days between April 16, 2001 and April 18, 2001. Tr. 386. He presented with complaints of worsening anxiety symptoms, including panic and agoraphobia, after trying to taper off his psychiatric medications over the previous 10 days. Tr. 417. He reported that the reason for discontinuation of medication was that his insurance coverage ran

FINDINGS AND RECOMMENDATION Page 34

out. Id. Mr. Cooper reported several diagnoses for which he was

being treated, including PTSD secondary to between nine and 12 MVAs

(one per year during the previous three years), panic disorder, and

depression. Id. He also reported that he had been sexually abused

as a child. Tr. 420, 426, 429.[19] He was admitted for stabilization

and observation. Lynn Alvarez, D.O. and Eric Khoury, M.D. attended

Mr. Cooper. He was diagnosed with adjustment disorder, along with

a notation: "[p]er patient: post-traumatic stress disorder, panic

disorder with agoraphobia," along with alcohol abuse/dependence and

frequent marijuana use. Tr. 386. Mark Wolf, M.D., wrote in Mr.

Cooper's chart notes that Mr. Cooper "describes anxiety, but not

classic panic attacks, and possibly agoraphobia." Tr. 427.

On June 14, 2001, Mr. Cooper was seen by Susan Levitte, M.D.,

a VA staff psychiatrist, for follow-up after his discharge from the

hospital. Tr. 408-09. Mr. Cooper reported that he had been off his

medications since January for lack of insurance. Tr. 409. He

reported long-standing problems with depression, anxiety, panic

attacks and anger management which had been worse for the past two

years. Id. Mr. Cooper said he had been in several motor vehicle

accidents and had chronic neck and back problems. Dr. Levitte noted

that Mr. Cooper told her he had had "whiplash about nine times."

Id. Mr. Cooper also told Dr. Levitte that "he was diagnosed as

---

[19] On June 14, 2001, Mr. Cooper told Dr. Levitte he was
abused by an older adolescent boy and girl when he was about six
years old, over a one week period, but denied having any history
of sexual abuse at any other times in his life and denied any
history of physical abuse. Tr. 412. On January 29, 2004, during a
psychodiagnostic examination by Christopher Tongue, Ph.D., Mr.
Cooper again "denie[d] any history of abuse or neglect." Tr. 829.

FINDINGS AND RECOMMENDATION Page 35

having post traumatic stress disorder related to the motor vehicle accidents by the previous psychiatrist whom he had seen." Id. Mr. Cooper told Dr. Levitte he had used marijuana "for many years, starting in the 1970s," as well as having smoked cocaine for four to five years starting in the late 1970s. Id. He also indicated that he had used amphetamines, peyote, mescaline, and LSD. Id. Mr. Cooper was currently smoking one to one and a half grams of marijuana a day, when available, for pain control. Tr. 411.

Mr. Cooper told Dr. Levitte he had last worked as a medical transportation driver before being laid off "because of his neck problem as he has reduced range of motion of his neck." Id.

On July 6, 2001, Dr. Levitte wrote that Mr. Cooper was "staying quite active," including mowing the yard, working on building a deck, caring for his dogs, and resuming online training to become a computer technician. Tr. 406-07. He had been having more back pain and headaches, and was taking Oxycontin from an old prescription.

On September 19, 2001, Mr. Cooper saw Dr. Levitte for anxiety, difficulty sleeping, and nightmares, which he attributed to the 9/11 terrorist attack. Tr. 404. He was looking for work. He was taking Oxycontin once or twice a week and continued to use marijuana for daily headaches. Id. Mr. Cooper brought in a form for Dr. Levitte to fill out stating that he was temporarily disabled, for the Oregon State Scholarship Commission. Dr. Levitte agreed to confirm a period of disability for three months. Id.

///

FINDINGS AND RECOMMENDATION Page 36

On November 20, 2001, Mr. Cooper told Dr. Levitte his mood had been on "an even keel" for two or three months, so he had decided to cut back on his medications starting in late September. Tr. 403. He reported no problems from doing this, and said his mood had been stable. Tr. 404. He was doing volunteer work one to two days a week for Oregon NORML and was enjoying it, but said he felt worn out after he returned home. Id. He was looking into getting employment. Id. Dr. Levitte noted that Mr. Cooper's affect and mood were very pleasant, with joking at times, and no irritability or dysphoria noted. Id.

On January 30, 2002, Mr. Cooper told Dr. Levitte he had been looking for work, but had been unsuccessful. Tr. 402. He was planning to go to the unemployment office because he had some leads on possible jobs. Id. On April 5, 2002, Mr. Cooper said he had been interviewing for jobs, but so far had not been able to get work. Tr. 401.

On June 7, 2002, Mr. Cooper reported to Dr. Levitte that he had been hired to do customer service work on the telephone. Tr. 399. Mr. Cooper said he continued to smoke marijuana, using 2 grams of medical grade marijuana, or the equivalent, per day. Id.

On August 6, 2002, Mr. Cooper told Dr. Levitte that he had missed the first day of orientation at the customer service job he had been hired for because of a migraine headache. Tr. 399. He attended the second day, but on the third day was fired for missing the first day. Id. He said he had been thinking about going to Eureka, California to work for his father, but he felt it would be

FINDINGS AND RECOMMENDATION Page 37

difficult "because of conflicts they have had." Id. Mr. Cooper reported using three to four grams of marijuana a day for pain control. Id.

On August 28, 2002, Mr. Cooper saw Dr. Hirsch, reporting that he currently took no medication for neck and back pain except cannabis tea for pain, headaches, muscle spasms or IBS, stating that it worked "fairly well for him." Tr. 794. Mr. Cooper continued to report low back pain, but said it was "less often and less intense." Id. He told Dr. Hirsch that the previous year, "he was able to build a deck in his backyard with some help, but it took 3 1/2 months to do this." Id. Mr. Cooper said physically he was doing "much better," but psychologically, "he is wreck." Id. He was going to an online chat room to help deal with his psychological issues, and "this seems to help more than anything." Id. Dr. Hirsch wrote, "He admits to lots of PTSD symptoms, but is unable to see Dr. Farley," because his bills were no longer being paid. He said he had tried "about six different medications for his PTSD symptoms," before settling on sertraline (Zoloft) and buspirone (BuSpar). Mr. Cooper said sertraline "tend[ed] to decrease his libido, and this is not acceptable..." Id. He was seeing a psychiatrist at the VA every two to four months. Id.

On January 31, 2003, Mr. Cooper saw Dr. Levitte, initially complaining of headaches nearly every day, but on further inquiry stating that he had migraines about two times a month and other headaches frequently. Tr. 396. Dr. Levitte offered a referral to the VA's headache clinic, but Mr. Cooper declined. He requested

FINDINGS AND RECOMMENDATION Page 38

medication for constipation, and said he had had constipation from narcotics in the past. Id.[20]

On July 22, 2003, Mr. Cooper saw Dr. Hirsch to request prescriptions for headaches for the next two months. Tr. 793. Dr. Hirsch noted that Mr. Cooper was currently a medical marijuana patient, but "his last crop failed and it takes a minimum of three months to grow a crop and he thinks it will be another two months before his crop will be mature." Id. Mr. Cooper described muscle tension headaches on a daily basis, saying that whenever he rotated his neck to the right at about 45 degrees he developed an instant headache, as well as a migraine headache about once a week. Id. Mr. Cooper said smoking three grams of marijuana a day kept his headaches under control, but that he had to go to the ER three times the previous year for migraines. Id. Mr. Cooper also reported a six month history of "very bad orthostatic hypotension," stating that he "almost passes out" at least once a week and that about once a day he had to lie on the floor to avoid falling. He described symptoms of tunnel vision, a tingling sensation and "some jerking when he comes back from the episodes." Id. He stated that he had been told he did not breathe during those episodes, but reported no seizure activity or loss of consciousness. Id.

On July 25, 2003, Mr. Cooper asked Dr. Levitte to fill out a statement for the Oregon Scholarship Commission that he was totally and permanently disabled. Tr. 394. Dr. Levitte told him she did not feel she could do so, and Mr. Cooper asked to speak with Dr.

---

[20] An interesting contrast to his IBS complaints.

FINDINGS AND RECOMMENDATION Page 39

Levitte's supervisor about her declining to state that he was permanently disabled, and to ask for a different provider. Id. A VA chart note states that Mr. Cooper "adamantly refuses" to return to Dr. Levitte. Tr. 878. According to a chart note dated May 31, 2006, Mr. Cooper was not seen at the VA after November 2003. Tr. 876.

On October 10, 2003, Mr. Cooper saw Phillip Leveque, M.D., who provided him with a medical marijuana card. Tr. 780-783.

On December 3, 2003, Mr. Cooper saw Dr. Hirsch for an upper respiratory infection. Tr. 788. He complained of daily headaches that he was unable to relieve by smoking marijuana because of coughing. Id. He reported that he had been "going about 20 hours per day, working on getting things set up for the medical marijuana awards which were held on 11/22/03." Id. He reported that he had "walked out" on his VA physician. Id.

On January 29, 2004, Mr. Cooper was given a psychodiagnostic examination by Christopher Tongue, Ph.D. Tr. 829. Mr. Cooper denied any history of abuse or neglect. Id. He reported a past medical history of mitral valve stenosis, diagnosed in 1992, and a diagnosis of possible esophageal spasms. Tr. 830.

Mr. Cooper reported 12 MVAs between 1977 and 2000. Id. He stated that he lost consciousness briefly in the accident of 2000. Id. Mr. Cooper said that since the last motor vehicle accident, he had suffered a number of symptoms of PTSD, which were related to his MVAs. Id. Mr. Cooper's current medications were Darvocet, Flexeril, medical marijuana in the amount of 3 1/2 to 5 grams per day, and Xanax as needed for anxiety. Tr. 831. Mr. Cooper reported

FINDINGS AND RECOMMENDATION Page 40

the onset of migraine headache at age 33, with a current frequency of approximately once a week. He also reported orthostatic hypotension episodically. Id.

Mr. Cooper stated that the onset of his cannabis use was 1975, and that for the past three years, he had used it regularly to manage pain and headache problems. Tr. 831. He had not obtained mental health treatment since terminating the relationship with Dr. Levitte in 2003. Id.

Mr. Cooper said he was diagnosed with PTSD after his MVA in 2000. Tr. 832. He said that by July 2000, he began to have anxiety, particularly when driving in a car, and that the anxiety had become progressively worse, so that he currently avoided leaving the house and typically felt unsafe away from home. Id. Mr. Cooper said that when he does not feel safe or gets anxious, "he responds with anger." Id. When his mood gets very low, he said, he has suicidal ideation. Id.

Mr. Cooper also complained of nightmares with a typical theme of falling or being trapped in burning cars or falling off a bridge in a car. Id. He said he had night sweats on a regular basis, as well as low appetite and anhedonia, "exemplified by his loss of interest in computer gaming that had been an avid hobby for him." Id.

He reported that on a typical day, he rises and feeds his two dogs at 10 a.m., but does not take them for walks because he is afraid to leave the house. Tr. 832. He spends the remainder of the day watching television, checking his email, and doing some

FINDINGS AND RECOMMENDATION Page 41

reading, although he said he had problems with concentration. Id. Mr. Cooper said he left the house "perhaps five times per month." He grocery shopped from one to three a.m. at a neighborhood market and said that even then, he sometimes had panic episodes. Id. Twice a month, he went to a public access TV station, where he was the producer for a show called "The NORML Hour." Id. He also attended Oregon NORML board meetings once a month. Id.

Dr. Tongue wrote,

> Information gathered from the patient with regard to history and symptoms suggests that he has suffered from post-traumatic stress disorder for several years. He additionally meets the diagnostic criteria for panic disorder with agoraphobia. His social avoidance and irritability are also characteristic of the PTSD. Complicating his anxiety symptoms is long-standing cannabis dependence dating back over what appears to be several decades.[21] With regard to his employability at present, the severity of Mr. Cooper's anxiety disorder symptoms are such that it is unlikely that he would tolerate a workplace environment without significant interference from psychological symptoms. There is some objective evidence from mental status that he might have trouble maintaining the concentration, persistence, and pace necessary for employment. However, he does not display any marked cognitive impairment. Noteworthy is that Mr. Cooper has not engaged in any substantial treatment of his symptoms of post-traumatic stress other than taking medication.

Tr. 833-34.

On February 2, 2004, Bill Hennings, Ph.D. and Dorothy Anderson, Ph.D., performed a records review on behalf of the Commissioner. Tr. 836. They concluded that Mr. Cooper had a mood disorder secondary to pain, depression, PTSD, anxiety, and a

---

[21] This footnote is added here to point out that the conclusion is that Mr. Cooper has been dependent on marijuana since at least 1984 and quite possibly 1975, well before the first medical records in this case.

1    substance abuse disorder. Tr. 839, 841. They assessed his

2    functional limitations as mild in the areas of activities of daily

3    living and maintaining social functioning, and moderate with

4    respect to maintaining concentration, persistence, or pace. Tr.

5    846. They concluded that he was moderately limited in his ability

6    to work in coordination with or proximity to others, and interact

7    appropriately with the general public because of anxiety and anger

8    issues, and that he was limited in his ability to take appropriate

9    precautions against normal hazards and operate machinery because of

10   chronic addiction to marijuana. Otherwise, Mr. Cooper was not

11   thought to be significantly limited in any vocational functions.

12   Tr. 852.

13       On June 8, 2004, Mr. Cooper saw Dr. Hirsch for pain medication

14   for daily headaches. Tr. 984. Mr. Cooper said he needed about a six

15   week supply of Percocet and more cyclobenzaprine. Tr. 984.

16       On September 21, 2005, Mr. Cooper was seen in the ER at Mt.

17   Hood Medical Center for chest pain. Tr. 903. Mr. Cooper reported

18   that earlier in the evening, he had become anxious with shortness

19   of breath. He took a Xanax, but the symptoms continued, and he

20   started to feel retrosternal chest pain. Id. Mr. Cooper said he had

21   had such pain before, and was diagnosed with esophageal spasms. Id.

22   He reported having chronic headaches and sharp, intermittent

23   abdominal pain for two days. Id. Physical examination was

24   unremarkable except for mild respiratory distress with anxiety and

25   hyperventilation. Tr. 904. EKG was normal. Id. Pulse oximetry

26   showed oxygen saturation of 100%. Id., tr. 994. Mr. Cooper was

27

28   FINDINGS AND RECOMMENDATION Page 43

given a cocktail of Mylanta, Lidocaine, and Donnatal, diagnosed with atypical chest pain, and was discharged home. Tr. 905.

On September 27, 2004, Mr. Cooper saw Dr. Hirsch for blood in his stool. Tr. 983. He also reported tiring easily and being unable to stand for more than about an hour before having pain associated with his hemorrhoids. Id. He said it took him about four hours to mow his back yard as he had to rest every 15 minutes because of "what he presumes is anemia." Id. Mr. Cooper also complained of IBS with cramping and spasms, as well as constipation alternating with diarrhea. Tr. 982. He was currently using marijuana, 1/2 gram 5-6 times per day, Xanax and cyclobenzaprine for tension headaches. Tr. 982. On October 25, 2004, Mr. Cooper saw Dr. Hirsch for complaints about hemorrhoids. Tr. 981. Otherwise, physical examination was unremarkable. Id.

On January 26, 2005, Mr. Cooper saw Dr. Hirsch for refills of Xanax for anxiety; cyclobenzaprine for tension headaches; Percocet for chronic pain; and Dulcolax for constipation. Tr. 977.

On February 8, 2006, Mr. Cooper was seen at the ER of Mt. Hood Medical Center for accidental ingestion of BuSpar. Tr. 898. Mr. Cooper was drowsy, but stated he was feeling drowsy previously from medical marijuana and pain medications that he had taken prior to the BuSpar. Id. There was no headache, dizziness, weakness, chest pain, palpitations, abdominal pain, vomiting, diarrhea, black stools, bloody stools, numbness, fever, sore throat, cough or difficulty breathing, or urinating. Id. After being given oral charcoal and observed for four hours, he was discharged. Tr. 899.

FINDINGS AND RECOMMENDATION Page 44

An EKG on February 9, 2006 was unremarkable. Tr. 993.

On March 1, 2006, Mr. Cooper had a radical hemorrhoidectomy. Tr. 883. An intraoperative colonoscopy and biopsy was benign. Id.

On March 14, 2006, Mr. Cooper was admitted to Mt. Hood Medical Center for anxiety and bizarre behavior. Tr. 892. The triage nurse reported that Mr. Cooper reported a "vague shaking episode," with "no obvious seizure but stiff and shaking a lot." Id. Mr. Cooper also said he had been having chest pain on and off for months, as well as a current mild headache. Id. Physical examination, labs, x-rays and EKG were unremarkable. Tr. 893. After being given Ativan, Mr. Cooper began "acting normal," eating at the hospital and saying he felt much better. Tr. 894. He was discharged home. Id. A CT scan of the head on March 15, 2006 was normal. Tr. 986. Chest x-rays and an EKG taken on March 15, 2006 were also unremarkable. Tr. 987, 992.

On March 21, 2006, Mr. Cooper was seen at Mt. Hood Medical Center for constipation. He was transferred to Good Samaritan Hospital for surgical management of impaction. Tr. 887, 915.

On December 26, 2006, Dr. Hirsch wrote a letter to Mr. Cooper's attorney. Tr. 1004. She opined that Mr. Cooper's impairments and symptoms imposed a number of limitations that made it difficult for him to function in any type of work environment, including access to a bathroom at all times because of his IBS; severe headaches sometimes lasting several days, during which he was able to "function minimally;" significant anemia, secondary to bleeding hemorrhoids, which in turn contributed to fatigue and

FINDINGS AND RECOMMENDATION Page 45

decreased stamina; depression, anxiety and agoraphobia; fear associated with motor vehicles; and difficulty being around others. Dr. Hirsch thought Mr. Cooper was mildly limited in his activities of daily living because he had difficulty leaving home and was afraid of motor vehicles. She thought he was markedly limited in social functioning, primarily because of his agoraphobia and generalized anxiety issues, and moderately limited in concentration, persistence and pace. Dr. Hirsch stated that during the time she had treated him, "Mr. Cooper has had several episodes of decompensation, such that he has been unable to leave home for prolonged periods of time. Tr. 1005. In her opinion, despite treatment, Mr. Cooper had "residual disease processes that have resulted in such marginal adjustment that even a slight increase in mental demands or change in environment would be predicted to cause him to decompensate." Id. Dr. Hirsch continued that she was aware of Mr. Cooper's medical marijuana use, and felt that "he uses it appropriately to manage medical symptoms." Id. She said she had "never had the sense that Mr. Cooper is malingering or intentionally exaggerating his symptoms. ... I ordinarily do not endorse disability for my patients, but in Mr. Cooper's case, I believe that he is an excellent candidate." Id.

### Hearing Testimony

Mr. Cooper testified that the symptoms of PTSD he experienced were nightmares, panic attacks, and "the anxiety issues." Tr. 1026. He said he had nightmares almost every night, and that they woke him up. He slept between four and six hours in 24, but usually

FINDINGS AND RECOMMENDATION Page 46

slept only about two hours at a time. Id. He said his nightmares were about "automobile crashes and things like that." Tr. 1027. When he was having a panic attack, "the adrenaline rush kicks in and I break into sweats." Id. Mr. Cooper said he had panic attacks "any time that I have to leave home," and, rarely, at home, two to three times a week. Tr. 1029. The panic attacks last 20 minutes to half an hour. Id. In addition to leaving home, situations that induce panic attacks or anxiety include crowds, shopping for food, mowing the front lawn. Tr. 1030. Mowing the lawn made him anxious because he was "afraid ... cars were going to come into the yard from mismanaged driving." Tr. 1030. Mr. Cooper has not driven since the summer of 2000; he gets around on the bus or has his roommate drive him. Id. Mr. Cooper said he only leaves home about once a week, for grocery shopping or doctors' appointments. Tr. 1032.

Mr. Cooper said he has pain "throughout my entire body," worse in the mid lower back area, where he has a constant, nagging ache, and in the neck. Tr. 1033. He said he had to be "very careful what I do all the time, on or off medications ... because ... I'm not as aware of the possibilities of further injuring myself or overdoing it." Tr. 1033. When he is using marijuana, his pain ranges from three to four on a 10-point scale; without cannabis or opiates, his headaches "can go right up into the 10, unbearable scale." Tr. 1034. Mr. Cooper said the medical marijuana allows him to take fewer opiates, with better consequences for his irritable bowel syndrome because the opiates cause constipation. Tr. 1035. Mr. Cooper said his migraines can occur from every other day to once a

month, depending on stress levels; he gets muscle tension headaches almost every day. Tr. 1036. Mr. Cooper explained that the muscle tension headaches come from damaged muscles in his neck and upper back that go into spasm. Tr. 1037. With the migraines, he gets nausea, light sensitivity, and some sound sensitivity. Tr. 1039.

Because of his back and neck problems, he cannot sit for more than an hour without having to spend a few minutes moving around and stretching. Tr. 1037. He cannot stand for more than an hour at a time because of back and neck pain. Tr. 1039. He can walk half a mile, but it takes about 15 to 20 minutes; if he tries to go faster, the pounding will set off the headaches. Tr. 1040. He cannot walk his dog because of the agoraphobia and because walking "stirs up the intestines" and exacerbates his IBS. Id. Mr. Cooper said he spends six hours a day lying down. Tr. 1041.

Mr. Cooper currently lives in a house with two male roommates. Tr. 1042. He testified that he gets along well with them; one has been his roommate for approximately 10 years. Tr. 1043. Mr. Cooper cleans, vacuuming twice a week, dusting once a week, and doing dishes. He also does yard work, including mowing the front and back yards weekly or biweekly in the spring and summer, pruning roses, weeding and watering. Tr. 1045, 1046.

The ALJ called a vocational expert, Kathryn Heatherly. Tr. 1048. She characterized Mr. Cooper's work from the past 15 years as medium to light, unskilled to semiskilled employment. Id. The ALJ asked her to consider a person of Mr. Cooper's age and education, able to perform light work with some restrictions based on

FINDINGS AND RECOMMENDATION Page 48

continued marijuana usage. With regard to mental limitations, the ALJ asked her to consider a person limited to brief work-related interaction with the public and co-workers, as well as limitations on the use of hazardous equipment and environments. Tr. 1050. The VE opined that such an individual could perform Mr. Cooper's past work of temporary office work, data entry and accounting. Tr. 1050.

### ALJ's Decision

The ALJ found, at step three, that Mr. Cooper had the following severe impairments: headaches, cervical and lumbar strains, depression, PTSD and substance abuse. Tr. 16. The physical impairments, alone or in combination, did not meet the criteria of any listed impairment. His mental impairments were found to result in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration persistence or pace, and no episodes of decompensation. Tr. 16-17.

The ALJ found, at step five, that Mr. Cooper had the residual functional capacity (RFC) to perform work at the light exertional level, with some restrictions on climbing and a total restriction on concentrated exposure to hazards. Tr. 17. Mr. Cooper was also limited to brief work-related interaction with the public and co-workers.

The ALJ concluded that Mr. Cooper's testimony about the intensity, persistence and limiting effects of his symptoms were not credible. Mr. Cooper's allegations of intense and persistent musculoskeletal pain were uncorroborated by treatment records (ER

reports, x-rays, MRIs and physical examinations) that revealed minimal objective findings to support Mr. Cooper's allegations of debilitating musculoskeletal limitations and by treatment records that reflected an active lifestyle (statements in July 2001 that he was mowing the yard, working on a deck, caring for his dogs, and resuming online training to become a computer technician, the report in November 2001 that he was doing volunteer work one or two days a week for Oregon NORML and looking for work; the statement in December 2003 that he had been going about 20 hours a day to set up medical marijuana awards), as well as Mr. Cooper's hearing testimony that before a recent move he had done all the yard work and that he continued to do half of the household chores. Tr. 19-20.

With respect to Mr. Cooper's testimony that he had migraines from every two or three days to once a month, the ALJ found Mr. Cooper's testimony inconsistent with treatment records from August 2002 in which Mr. Cooper reported  that he had experienced only 6 or 7 migraines over the past year. Tr. 20. The ALJ also noted that Mr. Cooper testified that he had suffered from migraines for 14 years, but had been able to work in the past in spite of them. Id.

The ALJ found not entirely credible Mr. Cooper's testimony that he had great difficulty leaving home. The ALJ cited Mr. Cooper's volunteer work with NORML, his reports that he was looking and interviewing for jobs, his report in June 2002 that he would be starting a customer service job that required a 1 1/2 hour commute on the bus, producing a TV show for NORML. The ALJ noted that while

FINDINGS AND RECOMMENDATION Page 50

Mr. Cooper may be unable to drive, he utilizes public transportation without apparent difficulty. Tr. 21. The ALJ discounted Mr. Cooper's testimony that he was unable to walk his dogs because of IBS because Mr. Cooper testified that he walks 1/2 mile to the bus stop. Tr. 21.

The ALJ noted the testimony of Mr. Cooper's roommate, David Bram. Mr. Bram reported in October 2000 that Mr. Cooper leaves home only when necessary, going to the grocery store once a month and to doctors' appointments weekly. Mr. Bram said Mr. Cooper talked to his girlfriend daily, used the internet, played computer games, read a lot and watched TV. He napped once or twice a day. He prepared meals, did laundry, dusted, vacuumed and took out the trash. Mr. Bram reported in November 2003 that Mr. Cooper left the house no more than three times a month, and that although he did chores and mowed the back yard, it took him longer than expected. The ALJ discounted this testimony based on the evidence that Mr. Cooper left home to volunteer at a cable access show and attend board meetings, "in addition to his frequent medical appointments." Id.

The ALJ gave little weight to Dr. Wicher's opinion that as of August 2000, Mr. Cooper's depression and anxiety could require 12 months to stabilize enough to permit a return to work. He found that Dr. Wicher's assessment was based on Mr. Cooper's self-reports of symptoms, which were not fully credible. The ALJ thought the opinion of Dr. Wicher was inconsistent with her examination findings, because on mental status examination Dr. Wicher found no

FINDINGS AND RECOMMENDATION Page 51

1  problems with memory or concentration, thought processes were
2  intact and affect was appropriate. He was pleasant and cooperative
3  and exhibited adequate persistence and pace with only mild
4  concentration deficits during testing. The ALJ also noted that her
5  opinion was inconsistent with that of treating psychiatrists Eric
6  Khoury, M.D., who opined in April 2001 that Mr. Cooper could return
7  to work without restriction and Dr. Levitte's refusal in July 2003
8  to certify him as totally disabled. [22]

9      The ALJ gave little weight to the opinion of Dr. Tongue that
10  the severity of Mr. Cooper's anxiety disorder made it unlikely he
11  would tolerate a workplace environment. The ALJ found this opinion
12  not consistent with Mr. Cooper's daily activities, including
13  volunteering twice a week to produce a TV show, attend board
14  meetings, and look for work, as well as working 20 hours a day on
15  the medical marijuana awards. Tr. 22. Additionally, the ALJ noted
16  that despite an allegation of debilitating anxiety, Mr. Cooper had
17  not received treatment other than medication management. Id.

18      The ALJ also gave little weight to Dr. Hirsch's opinion that
19  Mr. Cooper required access to a bathroom at all times, and the
20  ability to use it at will. Id. The ALJ found no evidence that Mr.
21  Cooper had significant limitations related to IBS, and noted that
22  Mr. Cooper had reported normal bowel movements with medication and

23

24      [22] I note that both Dr. Khoury and Dr. Levitte saw Mr. Cooper
25  after Dr. Wicher, eight months later in the case of Dr. Khoury
    and nearly three years later in the case of Dr. Levitte. Dr.
26  Wicher's opinion was that it *might* take 12 months for Mr. Cooper
    to return to work. Thus, Dr. Wicher's opinion is not necessarily
27  inconsistent with those of Dr. Khoury and Dr. Levitte.

28  FINDINGS AND RECOMMENDATION Page 52

fiber supplements. Tr. 23.[23] The ALJ rejected Dr. Hirsch's opinion that Mr. Cooper would decompensate readily and would not be reliable for full-time or even part-time work. Tr. 23. The ALJ pointed to evidence that Mr. Cooper had been able to work in the past despite his headaches, and was able to leave the house to attend appointments and board meetings, volunteer as a TV show producer, and look for work. Id. Moreover, the ALJ observed, Mr. Cooper was able to utilize public transportation without apparent difficulty, live with two roommates and get along well with them, be active in an organization, and pursue and interview for jobs. Id. The ALJ found no indication in mental status examinations of significant difficulties with concentration, persistence or pace. Id.

The ALJ accepted the opinions of the agency consultants that Mr. Cooper had the residual functional capacity to do light work, except that his marijuana use limited his ability to climb ladders, ropes and scaffolds, and exposure to hazards. Tr. 23. He was also limited to brief interactions with the public and co-workers. Id.

The ALJ found that Mr. Cooper had performed data entry as a temporary office worker in 1992 and 1993, a sedentary, semi-skilled job, and that he retained the residual functional capacity to do that past relevant work. Id.

///

///

---

[23] Note the report of constipation in contrast to typical IBS problems on page 38, line 25 to page 39, line 2.

FINDINGS AND RECOMMENDATION Page 53

1

**Standard**

2       The court must affirm the Commissioner's decision if it is

3  based on proper legal standards and the findings are supported by

4  substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111,

5  1113 (9th Cir. 1999). Substantial evidence is such relevant evidence

6  as a reasonable mind might accept as adequate to support a

7  conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971);

8  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In

9  determining whether the Commissioner's findings are supported by

10  substantial evidence, the court must review the administrative

11  record as a whole, weighing both the evidence that supports and the

12  evidence that detracts from the Commissioner's conclusion. Reddick

13  v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the

14  Commissioner's decision must be upheld even if "the evidence is

15  susceptible to more than one rational interpretation." Andrews, 53

16  F.3d at 1039-40.

17       The initial burden of proving disability rests on the

18  claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d

19  1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must

20  demonstrate an "inability to engage in any substantial gainful

21  activity by reason of any medically determinable physical or mental

22  impairment which ... has lasted or can be expected to last for a

23  continuous period of not less than 12 months[.]" 42 U.S.C. §

24  423(d)(1)(A).

25       A physical or mental impairment is "an impairment that results

26  from anatomical, physiological, or psychological abnormalities

27

28  FINDINGS AND RECOMMENDATION Page 54

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a

FINDINGS AND RECOMMENDATION Page 55

claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

1. Adverse credibility finding

Mr. Cooper challenges the ALJ's adverse credibility finding, arguing that Mr. Cooper's engagement in sporadic activities, at times when his symptoms were less severe and when he had an opportunity to rest and recuperate afterwards, is not a sufficient reason to find him not credible about his symptoms.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. Andrews, 53 F.3d at 1039. However, the ALJ's findings must be supported by specific, cogent reasons. Reddick, 157 F.3d at 722.

Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's subjective testimony must be "clear and convincing." Id. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. Id. The evidence upon which the ALJ relies must be substantial. Id. at 724. See also Holohan, 246 F.3d at 1208(same).

A claimant's testimony about pain may be disregarded if it is unsupported by medical evidence which supports the *existence* of such pain, although the claimant need not submit medical evidence which supports the *degree* of pain. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc).

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The only time the "clear and convincing" standard does not apply is when there is affirmative evidence suggesting that the claimant is malingering. Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008). However, the ALJ need not make a specific finding of malingering. Id.

The record before the court contains abundant affirmative evidence suggesting that Mr. Cooper is malingering. Dr. Jones questioned the persistence of Mr. Cooper's back symptoms five months after straining his back, stating that expected healing time was three months at most. Tr. 227. Dr. Jones also noted positive

FINDINGS AND RECOMMENDATION Page 57

Waddell's sign on February 4, 1999. Id. Doctors Gripekoven and Zivin observed "theatrical exaggerated pain behavior" in May 1999. Tr. 232. Dr. Schilperoort wrote in November 1999 that Mr. Cooper exhibited "notable amounts of pain behavior," and "disproportionate stated levels of pain ... as opposed, not only to valid objective findings, but also as opposed to his affect, behavior and movement ... when not under direct evaluation." Tr. 248. Dr. Schilperoort concluded that there was "notable overstatement[] of level of pain." Id. Dr. Hirsch's chart note of January 31, 2000 indicates that disability evaluators Dr. Smith (a neurologist) and Dr. Freedman (a psychologist) thought Mr. Cooper's pain was "nonexistent." Tr. 801. In May 2000, Mr. Cooper's physical capacities evaluation was found to be partially invalid. Tr. 264. In November 2000, Dr. Breen noted that Mr. Cooper's tenderness was "out of proportion to" his hemorrhoidal disease. Tr. 331. In January 2001, Dr. Wilson found pain that was "not consistent with objective findings." Tr. 342. In March 2001, Dr. Huggins thought Mr. Cooper's verbal reports of depression on psychological tests were inconsistent with his presentation. Tr. 380.

The ALJ's reasons for finding Mr. Cooper not fully credible were 1) minimal clinical findings to support Mr. Cooper's allegations of debilitating musculoskeletal limitations, including relatively benign x-rays and MRIs, and unremarkable physical examinations; 2) inconsistencies between his allegations of panic attacks and agoraphobia and his ability to a) participate in volunteer activities away from home, b) take public transportation

to numerous appointments, c) live with two roommates; and d) activities of daily living, including household chores, mowing the yard, working on a deck, and caring for two dogs; 3) the absence of significant difficulties with concentration, persistence or pace in mental status examinations; 4) resuming online training as a computer technician, 5) doing volunteer work one to two days a week, 6) looking for employment, and 7) working 20 hours per day to set up medical marijuana awards, produce a TV show, and attend board meetings.

In evaluating the credibility of a claimant's testimony, the ALJ is entitled to consider such factors as daily activities. Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001). With respect to those daily activities, the Ninth Circuit has held that if a claimant is "able to spend a substantial part of [his] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." Id.

I note that in addition to the ALJ's findings, the record is replete with exaggerated and inconsistent self reporting by Mr. Cooper, including the number and type of MVAs, injuries sustained from those MVAs, reports of psychiatric hospitalizations ranging from zero to three, the untrue claim that he had been diagnosed with PTSD, the untrue claim that he had a "stenosed" heart valve and "heart problems," untrue claims of diarrhea when contemporaneous medical records indicate constipation, his having

both denied and endorsed childhood sexual abuse, numerous overstatements, noted by doctors, of pain and disability complaints, and drug seeking behavior.

There is substantial evidence in the record suggesting that Mr. Cooper is not credible about the intensity or persistence of his symptoms, among other things. I find no error by the ALJ.

2. Rejection of opinions of Doctors Hirsch, Wicher and Tongue

Mr. Cooper asserts that the ALJ did not give sufficient reasons for rejecting the opinions of treating primary care physician Dr. Hirsch and examining psychologists Wicher and Tongue that Mr. Cooper was unable to leave his house consistently and with the regularity that would allow him to sustain a full-time job.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine, but do not treat; and 3) those who neither examine, nor treat. Holohan, 246 F.3d at 1201; 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan 246 F.3d at 1202; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan at 1202, see also 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, see id. and § 404.1527(d)(5). that Mr. Cooper has difficulty leaving his house, using vehicles to get around, and being around more than one

FINDINGS AND RECOMMENDATION Page 60

person at a time.

If the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. <u>Reddick</u> at 725.

<u>Dr. Hirsch</u>

Dr. Hirsch opined that Mr. Cooper would not be reliable if he were to attempt full time or part time employment because 1) abdominal pain, headaches, muscle spasms, and depression, anxiety, panic attacks and agoraphobia would cause him to miss too much work, and 2) because his need for constant access to a bathroom due to IBS might not be feasible. Dr. Hirsch thought Mr. Cooper was markedly limited in social functioning, and that he would decompensate by being unable to leave home for prolonged periods of time.

The ALJ gave Dr. Hirsch's opinion little weight because 1) there was no evidence that Mr. Cooper had significant limitations related to IBS that would require constant access to a bathroom; 2) Mr. Cooper had worked in the past despite a long history of headaches; and 3) Mr. Cooper was able to leave the house to attend medical appointments and board meetings, volunteer as a TV show producer, and look for work, as well as use public transportation, engage in the activities of an organization, and live with two roommates.

The record contains no medical evidence that suggests the existence of a condition that would cause Mr. Cooper to have

FINDINGS AND RECOMMENDATION Page 61

constant diarrhea; many of his medical records note that Mr. Cooper denies diarrhea, see, e.g., tr. 892 (denial of abdominal pain or diarrhea on March 14, 2006 hospital admission; tr. 898 (denial of abdominal pain or diarrhea at February 8, 2006 hospital admission). As a general rule, his bowel complaints are constipation, see, e.g., tr. 790 (chart note dated October 6, 2003: "irritable bowel syndrome/constipation; patient encouraged to take fiber and increase water); tr. 977 (chart note dated January 26, 2005: "chronic constipation;" patient advised to take Fibercon regularly), or blood in the stool caused by hemorrhoids, see, e.g., tr. 790 (chart note dated October 6, 2003: advised to avoid constipation that will likely contribute to bleeding and problems with hemorrhoids); tr. 396 (January 31, 2003 note that Mr. Cooper was requesting medication for constipation, saying he had had constipation from narcotics in the past). The medical evidence also indicates that Mr. Cooper is being treated fairly successfully for his bowel complaints. See, e.g., tr. 802 (notation Dec. 16, 1999 from Dr. Hirsch "constipation improved.") There is no indication in Dr. Hirsch's treatment records that Mr. Cooper had chronic diarrhea, and no indication in the records of Dr. Kane and the VA of treatment for chronic diarrhea.

Mr. Cooper's reported history of headaches includes several years in which he was working. As the ALJ noted, the record shows that Mr. Cooper attended medical and physical therapy appointments several times a month on average, and, by his own report, engaged in volunteer activities, produced a TV show, searched for work,

interviewed and was hired for a job, lived with two roommates, had a girlfriend on occasion, and cared for two dogs. This evidence directly contradicts the reports Mr. Cooper gave to Dr. Hirsch (an internist) about agoraphobia, debilitating daily headaches, panic attacks, and inability to be around other people. I conclude that the ALJ's rejection of Dr. Hirsch's opinions is based on substantial evidence in the record.

<u>Dr. Wicher</u>

The ALJ gave Dr. Wicher's opinion that Mr. Cooper's depression and anxiety might require 12 months to stabilize enough to return to work little weight, on the grounds that her assessment of Mr. Cooper's was based on self-reports that were not fully credible; because mental status examination revealed no problems with memory, concentration, persistence, pace, or thought processes, affect was appropriate, and Mr. Cooper was pleasant and cooperative; and because her opinion was inconsistent with that of treating psychiatrist Dr. Khoury, who opined in April 2001 that Mr. Cooper could return to work without restriction, and that of treating psychiatrist Dr. Levitte, who refused to certify Mr. Cooper as permanently disabled.

The opinions of treating psychiatrists Khoury and, particularly, Levitte, who saw Mr. Cooper on many occasions, are entitled to more weight than those of Dr. Wicher, who saw Mr. Cooper only once. <u>Reddick</u>, 157 F.3d at 725; <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). I find no error in the ALJ's relative weighting of Dr. Wicher's opinion where it was inconsistent with

FINDINGS AND RECOMMENDATION Page 63

the opinions of Doctors Khoury and Levitte. This is especially true when opinions are closely examined. Dr. Wicher, seeing Mr. Cooper in August 2000, but looking into the future, said Mr. Cooper's mental state *might* take 12 months to stabilize enough for Mr. Cooper to return to work. Dr. Khoury saw Mr. Cooper on one occasion eight months later, in April 2001, and Dr. Levitte saw him many times from June 2001 (10 months later) to January 2003 (two years and five months later). Even without the reasons the ALJ noted as problems for reliance on Dr. Wicher's prediction for the next 12 months after Mr. Cooper's visit with her, it is not unreasonable to rely on the assessment of treating doctors who saw him later, and who were able to make an actual assessment rather than a prediction. I doubt Dr. Wicher herself would be surprised by their later observations and opinions.

Interestingly, Dr. Wicher did not endorse all of Mr. Cooper's claimed problems. She specifically rejected Mr. Cooper's reported diagnoses of PTSD as he did not meet the diagnostic criteria even when his reported symptoms were accepted.

Nor did the ALJ err in rejecting Dr. Wicher's opinions in part because Mr. Cooper's self reports were not credible. Dr. Wicher wrote that Mr. Cooper's "levels of depression and anxiety at the present time, *by his report*, are quite debilitating. He finds it quite difficult to leave the house ... and he becomes intensely uncomfortable when he has been away from home for an extended period of time." (Emphasis added) Dr. Wicher specifically based her conclusion about Mr. Cooper's depression and anxiety on his own

1  report. The MMPI-2 did not, as Mr. Cooper asserts, support his
2  statement that he is unable to leave the house because of
3  depression and anxiety. According to Dr. Wicher, the MMPI-2 merely
4  produced a profile indicating that Mr. Cooper's responses were
5  consistent with persons who tended to be socially isolated,
6  alienated from others, and suspicious about the motivations of
7  others.

8      <u>Dr. Tongue</u>

9      Mr. Cooper contends that the ALJ did not give sufficient
10  reasons for rejecting the opinion of Dr. Tongue in January 2004
11  that Mr. Cooper's anxiety disorder symptoms made it unlikely that
12  he could tolerate a workplace environment without significant
13  interference from psychological symptoms. The ALJ's rationale for
14  rejecting this opinion was its inconsistency with Mr. Cooper's
15  activities with NORML (producing a TV show, attending board
16  meetings, putting together an awards ceremony) and job search
17  efforts, as well as the absence of ongoing treatment other than
18  medication management.

19      Mr. Cooper argues that the ability to engage in volunteer
20  activities a few days a week was not equivalent to working eight
21  hours a day, five days a week. This argument construes the ALJ's
22  findings too narrowly. The ALJ found that Mr. Cooper's activities
23  with NORML, his job search efforts, and his apparent ability to
24  take public transportation several times a month for appointments
25  undermine not only opinion evidence that Mr. Cooper is unable to
26  leave home, but also Mr. Cooper's credibility.

27

28  FINDINGS AND RECOMMENDATION Page 65

1    Credibility determinations bear on evaluations of medical
2    evidence when an ALJ is presented with conflicting medical opinions
3    or inconsistency between a claimant's subjective complaints and his
4    diagnosed conditions. <u>Webb v. Barnhart</u>, 433 F.3d 683, 688 (9th Cir.
5    2005). Thus, the ALJ may properly reject a medical opinion that
6    relies on a claimant's discredited subjective complaints or its
7    inconsistency with a claimant's daily activities. <u>Tommasetti v.</u>
8    <u>Astrue</u>, 533 F.3d 1035, 1040 (9th Cir. 2008).

9        Dr. Tongue's opinion is explicitly premised upon Mr. Cooper's
10   own accounts of his limitations: "*Information gathered from the*
11   *patient with regard to history and symptoms suggests* that he has
12   suffered from post-traumatic stress disorder for several years [as
13   well as] panic disorder with agoraphobia." Tr. 833. (Emphasis
14   added) The ALJ rejected Dr. Tongue's opinion because it relied on
15   Mr. Cooper's subjective complaints and because it was inconsistent
16   with Mr. Cooper's reported activities. I find no error here.

17       <u>Doctors Kane and Farley</u>

18       In his reply brief, Mr. Cooper argues that the ALJ also
19   improperly rejected the opinions of Doctors Kane and Farley that
20   Mr. Cooper suffered from agoraphobia and profound anxiety about
21   getting into a car, both of which precluded a return to gainful
22   employment. Because these doctors also relied on Mr. Cooper's
23   statements for these opinions, and because they are inconsistent
24   with Mr. Cooper's reported volunteer activities, his frequent use
25   of public transportation, and his conduct directed at seeking
26   employment, I again find no error.

27

28   FINDINGS AND RECOMMENDATION Page 66

3.    Improper classification of Mr. Cooper's past relevant work

The VE testified that the only past relevant employment that was within the hypothetical given to her by the ALJ was as temporary office worker.[24] Tr. 1049. The VE characterized this work as "sedentary, semiskilled, performing data entry and accounting duties from 1992 to '93." Id. The ALJ concluded, on the basis of the VE's testimony, that Mr. Cooper could perform his past relevant work as a data entry worker.

Mr. Cooper argues that his temporary office worker job, as he himself described it, was a composite job that included data entry, but whose Dictionary of Occupational Titles (DOT) descriptions are inconsistent with the ALJ's limitation to light work and limited interaction with co-workers. Mr. Cooper cites DOT entries for office manager, which is defined as a supervisory job needing interaction with workers, and civil service clerk, which requires the ability to work with people. However, neither of these DOT entries defines temporary office work.

Mr. Cooper concedes that a search through the DOT for the term "office worker" yields a list of 19 different job classifications supporting Mr. Cooper's description of the job. However, Mr. Cooper argues, the ALJ erred by finding that Mr. Cooper could perform only one aspect of his past composite job, i.e., data entry. Mr. Cooper contends that by finding Mr. Cooper able to return to only one

_____

[24] The ALJ's hypothetical to the VE was of an individual able to perform light work with some postural and environmental limitations, based on marijuana usage. Tr. 1049-50. Additionally, the hypothetical individual was limited to brief work-related interaction with the public and co-workers. Tr. 1050.

1  aspect of his previous job, the ALJ violated the Ninth Circuit rule
2  against classifying occupations by their least demanding
3  characteristics. Valencia v. Heckler, 751 F.2d 1082 (9th Cir.
4  1985)(where an individual can perform only one or more tasks
5  associated with previous jobs, he must be deemed unable to perform
6  his past relevant work). See also Vertigan, 260 F.3d at 1051-52
7  (error for ALJ to find claimant could perform past relevant work as
8  cashier, when claimant had never held a separate job as a cashier;
9  cashier work had been part of another job she could no longer
10 perform); Carmickle, 533 F.3d at 1167(ALJ's determination that
11 claimant's past work was light exertion improperly focused on
12 supervisory aspect of job, which constituted only 20% of claimant's
13 duties, rather than on job as actually performed by claimant, 80%
14 of which required manual labor).

15      This line of cases does not govern the situation here. The ALJ
16 found that Mr. Cooper had the RFC to perform light work with some
17 restrictions. The VE categorized the tasks of temporary office
18 worker, as performed by Mr. Cooper (data entry and accounting) as
19 sedentary and semi-skilled. Thus, Mr. Cooper did not carry his
20 burden at step four of proving that he was unable to perform any of
21 his past work.

22      In finding that Mr. Cooper could perform his past relevant
23 work of data entry, the ALJ was not basing his RFC on the least
24 demanding aspect of that job.[25] All aspects of the temporary office

25  _____

26      [25] The ALJ also noted in his opinion the evidence that Mr.
27 Cooper was taking correspondence courses to become a computer
    technician (tr. 378, 406-07), and Mr. Cooper's self-reported use

28 FINDINGS AND RECOMMENDATION Page 68

worker job were characterized by the VE as sedentary, a less demanding level of exertion than the light work the ALJ found Mr. Cooper able to do. In this case, there was no evidence in the record that there was any aspect of Mr. Cooper's previous job as temporary office worker that Mr. Cooper was physically unable to perform; nor was there any evidence that data entry was the least physically demanding aspect of a temporary office worker job. Consequently the ALJ did not improperly classify Mr. Cooper's prior work as a temporary office worker "according to the least demanding function." Valencia, 751 F.2d at 1086.  I conclude that the ALJ did not err here.

**Conclusion**

I recommend that the Commissioner's decision be AFFIRMED.

**Scheduling Order**

These Findings and Recommendation will be referred to a district judge.  Objections, if any, are due September 13, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due September 28, 2010.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 25th day of August, 2010.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

_____

of the internet and playing computer games. See tr. 19, 21.

OPINION AND ORDER Page 69